King,' J.
This action was brought in the court of common pleas by Edwin C. Walker, against James Mr. Ashley, Jr'., setting forth that the defendant, Ashley, on or about the 8th day of February, 1896, entered .into an agreement in writing,of which this is a copy:
*661 “February 8th, 1893.
“Mr. William S. Calhoun,
“Dear sir:
“For value received you may deliver to me at any time within four (4) months from date two thousand shares (2000) Toledo, Ann Arbor & Nor. Mich, stock at thirty-nine dollars a share. An indenture on back.
(Signed) „ “J, M. Ashley, Jr-”
On the back of said paper is written the following:
“2-8-93.
“This put becomes operative and in full force and effect in blocks of 500 as the numbers of the certificates under this put are given to me and is good only for the certificates so enumerated to the full number of 2000 shares.
(Signed) “J. M. Ashley, Jr.”
The petition also averred that subsequent to the execution of this put, Calhoun had purchased one thousand shares of the stock of this railroad, within the period named in the contract, to-wit, four months, and that on the 26th day of April, 1893, he had duly tendered the stock to the defendant,' who had declined to receive it, and refused to pay for it. That thereafter the stock had been sold by him on account of defendant, at the best prices which could be obtained therefor, which was very much ’ less than the sum named in the contract,of $39 per share. That he had thereby sustained damages in the sum of $25,525.00, for which he asks judgment with interest thereon from April 26, 1893.
To this petition an answer was filed denying that on the day named, the defendant entered into a contract with William S. Calhoun like the one set up in the petition, but admitting that a certain agreement had been made, without setting forth what it was, but claiming that the plaintiff should, on the trial, produce proof of his agreement. Then there were certain denials, denying that he purchased the stock which it was claimed he had purchased, and denying *662 that he had transferred his title in it to the plaintiff Edwin C. Walker. Then there was a cross-petition.
This action came on for trial in the court of common pleas upon these issues; evidence was introduced, after which the court charged the jury to return a verdict for the plaintiff for the amount claimed in the petition. Motion for a new trial was made and overruled, and it is sought here to reverse the judgfhent rendered upon that verdict because it is contrary to the law and the evidence, and because it is alleged that the court committed error at the trial, in instructing the jury to return a verdict for the plaintiff.
The first-reason assigned by counsel for plaintiff in error for the reversal of this judgment ia: That the contract sued upon was not binding upon the plaintiff, but only binding— if on anybody — upon the defendant; in other words, that it a unilateral contract. The agreement was that the defendant, within four months, was to pay $39 a share for 2000 shares of stock that shold be furnished to him by Calhoun, but that Calhoun did not agree that he would furnish 2000 shares, or any other number of.shares, within that time.
We do not look upon that contract with the view taken of it by counsel for plaintiff in error. In the first place, it will be borne in mind that the contract recites a consideration: “For a valuable consideration, I agree to take and pay for 2000 shares of this stock to be sold and delivered to me by Mr. Calhoun, if the same be delivered within four months and in blocks of not less than 500 shares at a time. ” So that the contract iitself imports a consideration for the option.
Again, we think it would be binding when accepted; and that an acceptance is shown when the person named in the -contract complied with its terms, had purchased and continued to offer to Mr. Ashley the stock named in the contract, or a part thereof, in blocks of not less than 500 shares.
A text book cited is Clark on Contracts, pages 168-9:
*663 “In snch case, however,- according'to the better opinion, -as we have seen in treating of offer and acceptance, the •promisor is in the position of one who has made a continuing •offer,which, though it may be withdrawn before anything is done by the promisee, will become binding in return, or by doing the acts contemplated. In giving the promise or •otherwise supplying the consideration, he supplies the element of mutuality. If, therefore, a person promises to sell such goods as another may order, or to sell land if another ■shall choose to buy it, and before his order is withdrawn the other orders goods, or agrees to buy the land, the promisor is bound to sell at the price named.”
And one or two authorities I will briefly refer to:
70 N. Y,, 202, is a case almost like the one before the •court.
“A contract whereby A., for a valuable consideration, •agrees to purchase of B. gold coin at a specified price within a specified time, B. having the option to deliver or not, is not upon its face a wager contract within the meaning of •the statutory provision declaring such contracts void.”
They do not there discuss the question of mutuality, but 'they decide that the contract was binding upon the purchase and offer of the coin.
So in 71 N. Y., 420, in a case similar in point:
“An agreement for a valuable consideration by A-. to ■purchase from or sell to B., at the option of the latter, a Certain number of shares of stock within a limited time at a specified price is not. per se a gambling contract. An illegal intent will not be presumed; and in the absence of proof that the parties were merely speculating upon the ■fluctuations in the price of th.e stock without any intent that A. should deliver or accept, but simply should pay difference, the contract is valid and may be enforced.”
In that case it seems that the objection was that it was a gambling contract. That objection is not urged to this contract. But the stock itself was to be sold, provided that 'Calhoun should, within the time named, purchase and deliver, or tender to the purchaser, the stock in question, in *664 the amounts named; so there is no element of gambling in the contract, and these authorities are to the effect that contracts precisely like it would be binding. No question, •was raised in those cases that the contract was not mutual. In the second place it is urged that the court,in instructing the jury to return a verdict for the amount claimed in plaintiff’s petition, established a rule of damages that is incorrect.
In effect, the court held that the rule of damages in the case at bar was the amount of the difference between the-price named in the contract and the amount which had been received for the stock upon a sale made by Calhoun, some* days or weeks afterwards; and it is contended that the true rule of damages should be the difference between the amount named in th6 contract and the value of the stock at the' time and place when it was tendered or offered.
It appears plainly from the evidence that on the day when this stock was tendered,it was worth substantially the price named in the- contract — $39 per share. It appears-from the evidence — -at least Mr, Calhoun, testifying for the plaintiff says, that he retained the stock in his possession until about the 19th of May — between the 19th and the 25th of May (the tender being made on the 26th of April), and between the 19th and 25th he sold this stock in the stock market in New York, at the Exchange, at public sale; that is, it was public to the persons who were members of the stock exchange; and that he obtained the best price that’ could be got on that day, which was about $11 or $11.50' per share, very much less than the price which ruled on the 26th of April; so that, if the measure of damages be that claimed by the plaintiff in error, the damages to be-awarded to the plaintiff below would be scarcely more than nominal; while, if the rule adopted by the court below was-correct, the rule of damages would be that upon which the jury found. Taking Mr. Calhoun’s testimony as a basis,, there is no question but what the loss was correctly stated.
*665 We think the court below adopted the correct rule upon that subject, and I will refer briefly to two or three authorities upon that question:
70 N. Y., 13, is a case holding that-rule of damages.
In 140 N. Y., 70, is another case. I read from the syllabus:
“A vendor of personal property not delivered, has three remedies against the vendee in default: he may store the property for the buyer and sue for the purchase price; he may sell the property as agent for the vendee, and recover any deficiency resulting, or he may keep the property as-his own and recover the difference between the contract and the market price at the time and place of delivery.”
In Benjamin on Sales (6th Edition), p, 774, the rule is-stated thus:
“The vendor’s remedy, after a re-sale made in the absence of an express reservation of that right, is assumpsit on the original contract, which was not rescinded by the re-sale. And in this action he may recover as damages the actual loss on the re-sale composed of the difference in price and expenses, or he may refuse to give credit for the proceeds of the re-sale and claim the whole price, leaving the buyer to a counter-claim for damages of the re-sale.”
On page 775, in an “American Note”, it is stated:
‘.‘The right of re-sale on the default of the buyer to make payment, and to recover the difference between the proceeds and the original contract price, is universally established in this country.”
Citing numerous authorities.)
“In such sales the vendor acts as agent for the vendee, as the title is not ordinarily re-transferred to him by the-mere default of the vendee in making the stipulated payment. ”
Then, among the authorities which are cited, are: 70 N. Y., 13; 21 Wisconsin, 562, and others; citing numerous cases. These authorities say:
“It is not necessary that the sale should have been made at the earliest possible moment after the default is known,, even though the article be falling in market.”
*666 “Notice to the buyer of the time and place of re-sale is •usual, and is important as tending to prove the sale a fair •one; but it is not absolutely necessary in all cases that such notice should have been given.”
“If the re-sale be fairly made, especially if at public auction, the amount thus obtained is considered as a fair test of the market value, and the difference between the amount thus received and the original contract price is therefore the true standard of the vendor’s damages.”
And a case is cited in 18 Grattan, 785, which sustains the same general doctrine. These authorities would therefore bear out, we think, the rule held by the court below when it undertook to instruct the jury in this case that the measure of damages was the amount named in the plaintiff's petition; but these authorities go a trifle further than that, Oases which I have referred to and did not read hold, that if the vendor or promisor shall undertake to act as the agent of the vendee and re-sell the property, he must do so within a reasonable time, and it is held in one of these New York cases that a delay of two months was not unreasonable. "In the case which I have referred to —18 Grattan — it was held that a delay of five months was not unreasonable.
The plaintiff in error, however, claims that that question should have been submitted to the jury that it was for their determination.- We had occasion to discuss that question in the case of Gladwell v. Holcomb, et al., which I find in the 7th Ohio Circuit Court Reports, page 369. In that opinion the American & English Encyclopaedia of Law is referred to, where it is said, on page 641: vol. 19:
“On principle, it would appear that if a statute or any positive rule of law prescribes the doing of an act within a reasonable time, it is the province of the court in construing such law, to declare whether a given time is, within the •intent or meaning of the law, a reasonable time. So in the ■interpretation of a written instrument specifying a reasonable time, the question what is such time, is one for the ■court to answer, after considering the terms of the instru *667 ■ment and the intent of the parties. But an important qualification to both of the above principles is to be noted. If the question as to what is a reasonable time is not resolved expressly or, impliedly by the rule of law, or by the writing which is under consideration, so that the judge in deciding the question would have no legal ground, but merely his individual ideas to go 'upon; and especially if, in addition, the question depends in the individual case upon peculiar, numerous or complicated circumstances — ■ the reasonableness of the time becomes a question for the jury, whose province it is, rather than that of the judge, to say, in view of all the facts of the case, whether or not the time in question is reasonable in the sense of being in accordance with the course of business and the ordinary transactions of life. It has, however, been said that the time in ■question may be so short or so long that the court will declare it, as a matter of law, to be reasonable or unreasonable. ’ ’
And under the latter proposition there is cited in the Encyclopaedia quite a number of cases which seem to sustain the doctrine there laid down, And in line with the proposition above as to submission to the jury, there are a great many cases cited in the Encyclopaedia, and among them a case in 14 Ohio St., 18, which is the only one I care here to refer to. This was a controversy between execution creditors, and the question was whether an officer who held an execution and had levied under the same, had unreasonably delayed to sell the property,so that the creditor in that execution had thereby lost his priority. The court say, in the second proposition of the syllabi, (p. 18):
“The question whether the delay, if any, was reasonable ■or unreasonable, depends on all the circumstances surrounding the parties and the property seized in execution, and is, peculiarly, a question for the jury, under the instructions of the court.’'
Now these authorities would seem, perhaps, to be opposed to the rule which was stated in the case cited by this court, but we think they are not: they only apply to different cases, as we undsrtake to say there that we think *668 it a proper rule that where the tima is clearly either reasonable or unreasonable, it is the duty of the court so to determine, just as it would be the duty of the court in an action based upon negligence-^-said to be a mixed question of law and of fact and one peculiary for the jury — yet, where the' acts were such that any reasonable man would say that they were the exercise of ordinary care, it is the duty of the court' to say so; or where the acts were such that a reasonable' minded man would say it was negligence, it would be the-duty of the court to say so; but in any case of doubt, or-where minds might differ, it has been held by the supreme-court that it is a question for the jury. In the Gladwellcase before the court at that time, there was no question■ made that, if the rule of law was that reasonable time should ■ be given, that that reasonable time had in that case been given — -which was a notice to leave the premises — the contention being that the law was that the common law rule should prevail. The court held that the justice of the peace-had not erred in saying that the time named (four months)' was a reasonable time. But, in this case, the facts and-circumstances are very different. In this case it appears-that on the day when this tender was made, this stock was substantially worth the price named in the contract. It fell* on that day several dollars per share, and some days later-it raised, and then again it fell and seemed to continue to-fall until about the 19th or 29th of May it had fallen to-about eleven cents per share, and then Mr. Calhoun put it upon the market and sold it, claiming here, as he does,, that he sold it for Mr. Ashley,the defendant.
Now, we think whether that was done within a reasonable time or not, in view of all the circumstances of the case, in view of the condition of the market, in view of the character of the stock, in view of what was the condition of the railroad of which this was the stock, that the whole question should have been submitted to the jury to determine *669 whether that sale was made within a reasonable time. Again, it appears in this evidence, by the testimony of Cal- . hoim and of another individual who was present with him, that they made a tender of this stock on the 26th day of April,and that Mr. Ashley refused to receive it; that on the following day they returned with the stock and presented it to Mr. Ashley, and he again refused to receive it. They ■do not, either of them,testify to any conditions attached by .Mr. Ashley to his refusal on either day. Their testimony was taken by deposition, and they were not present at the “trial. On the trial of the case Mr. Ashley testified that Calhoun tendered him the stock on the day named and he refused to receive it, claiming that it was the custom or rule of the stock exchange that he should have 24 hours within which to accept the stock — in other words: — 24 hours within which to get ready to pay it; that there was some conversation about it, and the men went away. They took ■the numbers of the stock, and thereupon he followed them, - amd they went directly to the stock exchange, to the floor thereof, and the same man who had offered him a thousand •shares, put up the thousand.shares for sale and sold it immediately for 138.50 per share. .That on the next day he came back with another thousand shares of stock. On cross- • examination Mr. Ashley says the stock brought to him on the second day was the same stock which was brought on the first day. It is not clear, that is from that testimony, that Mr. Ashley meant to say that he brought the same ■■identical certificates on the second day that he brought him ■on the first day. We think that,as it appears here that Mr. ■ Calhoun himself was the owner of only a thousand shares ■which he bought for the purpose of fulfilling his contract, that he must have kept his tender good, and must have sold the identical stock in May that he tendered on the 26th of April. He could not tender this stock and then turn that ■over to the broker and tell him to sell it, then borrow some >more stock and go back and make a new tender.
C. 8. Ashley, for Plaintiff in Error,
Seribner & Waite, for Defendant in Error.
It was suggested that it made no difference whether that was the same stock or not, but we think it does. If he were a general stock broker, and had a large amount of this stock, and he had offered Mr. Ashley a thousand shares and Mr. Ashley had not accepted it, and he had' gone away and then sold perhaps the precise thousand shares, but had kept the tender good for a thousand shares, perhaps it might make no difference; but Mr. Calhoun was not a stock broker and he did not himself, individually, offer this stock for sale — -it was offered by a stock broker, by an agent of the plaintiff in this case, named Taylor, who had access to the floor of the stock exchange, and Mr. Calhoun was not in that business. He had entered into these negotiations perhaps to make a little money and to help Mr. Ashley, so that if his thousand-shares of stock was actually sold on the day he made that tender, he must stand by the price received for it. There is evidence to indicate that tbere was a dispute on this question, and that should have been submitted to the jury— therefore this judgment will be reversed, and the case remanded for a new trial. '